Reed W. Larsen (3427) Local Counsel
COOPER & LARSEN, CHARTERED
151 North 3rd Avenue, 2nd Floor
P.O. Box 4229
Pocatello, ID 83205-4229
Telephone: (208) 235-1145
Facsimile: (208) 235-1182
reed@cooper-larsen.com

Ben C. Martin (pro hac vice to be filed)
Texas Bar No. 13052400
Laura J. Baughman (pro hac vice to be filed)
Texas Bar No, 00791846
MARTIN BAUGHMAN, PLLC
3710 Rawlins, Suite 1230
Dallas, Texas 75219
Telephone: (214) 761-6614
Facsimile: (214) 744-7590
bmartin@martinbaughman.com
lbaughman@martinbaughman.com

ATTORNEY FOR PLAINTIFF

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF IDAHO

| | |
|---|---|
| MARY SCHNEIDER, ) | CASE No.: _____ |
| ) | |
| Plaintiff, ) | |
| v. ) | **COMPLAINT FOR DAMAGES** |
| AMERICAN MEDICAL SYSTEMS, INC., ) | **AND JURY DEMAND** |
| AMERICAN MEDICAL SYSTEMS ) | |
| HOLDING, INC., ASTORA WOMEN'S ) | |
| HEALTH, LLC, ENDO ) | |
| PHARMACEUTICALS, INC., ENDO ) | |
| PHARMACEUTICALS HOLDINGS, ) | |
| INC., AND ENDO HEALTH ) | |
| SOLUTIONS, INC., ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |
| ) | |

Plaintiff MARY SCHNEIDER files this Complaint and for her causes of action against Defendants, AMERICAN MEDICAL SYSTEMS, INC, AMERICAN MEDICAL SYSTEMS HOLDING, INC., ASTORA WOMEN'S HEALTH, LLC, ENDO PHARMACEUTICALS, INC., ENDO PHARMACEUTICALS HOLDINGS, INC., and ENDO HEALTH SOLUTIONS, INC., alleges as follows:

## INTRODUCTION

1.     On September 12, 2013, Plaintiff MARY SCHNEIDER was surgically implanted with the Monarc subfascial hammock system, a medical device designed, manufactured, and marketed by the Defendant, American Medical System, Inc. Although the system was intended to treat urinary incontinence, neither Plaintiff nor her healthcare providers were warned that the product was defective and negligently designed and manufactured. On or about August 21, 2019, Plaintiff was diagnosed with complications caused by the defective mesh and surgical revision was recommended. As a result of being surgically implanted with the defective transvaginal mesh device, Plaintiff has suffered, and continues to suffer, debilitating injuries, as described further herein. Plaintiff brings this suit for damages related to those injuries.

## PARTIES

2.     Plaintiff MARY SCHNEIDER is a citizen and resident of Idaho.

3.     Defendants AMERICAN MEDICAL SYSTEMS, INC. ("AMS"), subsequently believed to be known as Astora Women's Health, a wholly owned subsidiary of Defendant American Medical Systems Holding Inc., Astora Women's Health Holdings, Inc., and/or Defendant Endo Pharmaceuticals, Inc., Defendant Endo Pharmaceuticals Holding Inc. and/or Defendant Endo Health Solutions Inc., was a Delaware corporation and may be served pursuant to 10 Del. C. § 3111 by serving registered agent, Corporation Trust Company, at 1209 N. Orange

Street, Wilmington, Delaware 19801.

4.     Defendant AMERICAN MEDICAL SYSTEMS HOLDINGS INC., ("AMS HOLDINGS") subsequently believed to be known as Astora Women's Health Holdings or Astora Women's Health, is a Delaware corporation and may be served pursuant to 10 Del. C. § 3111 by serving registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801. This defendant is or was the parent of wholly-owned subsidiary AMS.

5.     Defendant ASTORA WOMEN'S HEALTH, LLC ("Astora'), survivor of merger with or acquiring corporation of AMS, Inc. and/or AMS Holdings, Inc, is a Delaware corporation and may be served pursuant to 10 Del. C. § 3111 by serving registered agent, The Corporation Trust Company, Corporation Trust Center, 1209 Orange St., Wilmington, DE 19801.

6.     Defendant ENDO PHARMACEUTICALS, INC. ("ENDO") is a Pennsylvania corporation, with its principal place of business at 1400 Atwater Drive, Malvern, Pennsylvania 19355. ENDO may be served through registered agent, Corporation Trust Company, at 1209 N. Orange Street, Wilmington, Delaware 19801.

7.     Defendant ENDO PHARMACEUTICALS HOLDINGS, INC. ("ENDO HOLDINGS") (now known as Endo Health Solutions, Inc.) is a Delaware corporation with its principal place of business at 1400 Atwater Drive, Malvern, Pennsylvania 19355. ENDO HOLDINGS may be served through its registered agent, Corporation Trust Company, at 1209 N. Orange Street, Wilmington, Delaware 19801. ENDO HOLDINGS was the parent of wholly owned subsidiary, ENDO. On May 23, 2012, ENDO HOLDINGS changed its name to Endo Health Solutions, Inc.

8.     Defendant ENDO HEALTH SOLUTIONS, INC. ("ENDO HEALTH SOLUTIONS"), formerly known as Endo Pharmaceutical Holdings, Inc., is a Delaware

corporation with its principal place of business at 1400 Atwater Drive, Malvern, Pennsylvania 19355 and is a parent or survivor of mergers with of AMS and AMS HOLDINGS. ENDO HEALTH SOLUTIONS may be served through registered agent, Corporation Trust Company, at 1209 N. Orange Street, Wilmington, Delaware 19801.

## JURISDICTION AND VENUE

9.      The Court has jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a) inasmuch as the amount in controversy exceeds $75,000 and the Plaintiff is a citizen of a different state than one or more of the Defendants.

10.     At all times material hereto, Defendants were engaged in the business of developing, manufacturing, licensing, promoting, marketing, distributing, testing, warranting and/or selling in interstate commerce throughout the United States, including Idaho, either directly or indirectly, medical devices intended to treat stress urinary incontinence and/or pelvic organ prolapse, including the Monarc product that were implanted into Plaintiff in Idaho.

11.     Venue in this district for pretrial proceedings in these civil actions is proper under 28 U.S.C. § 1391, inasmuch as a substantial part of the events or omissions giving rise to the claim occurred in this district.

12.     Defendants are subject to *in personam* jurisdiction in the U.S. District Court for the District of Idaho because Defendants placed defective products in the stream of commerce and all or some of those products were implanted into and caused personal injuries to Plaintiff, an Idaho resident, in the State of Idaho. Each Defendant has sufficient minimum contacts in Idaho or otherwise intentionally avails itself of the Idaho market through, without limitation, its advertisement, promotion, marketing, sales and/or distribution and other business activities, so as

to render the exercise of jurisdiction over it by the Idaho courts consistent with traditional notions of fair play and substantial justice.

## FACTUAL BACKGROUND

### History and Relationship of Certain Defendants

13.     American Medical Systems, Inc. ("AMS, Inc."), a corporation formed pursuant to the laws of the State of Delaware, obtained clearance from the FDA and designed, developed, manufactured, marketed, distributed, and sold products to treat pelvic organ prolapsed and/or stress urinary incontinence, including the Pelvic Mesh Product which is the subject of this lawsuit. AMS, Inc. was a wholly owned subsidiary of American Medical Systems Holdings, Inc. ("AMS Holdings, Inc") also a Delaware corporation. These entities are sometimes referred to herein as "AMS." On information and belief, AMS, Inc. changed its name to, merged with, or was otherwise subsumed by Astor Women's Health.

14.     In May 2000, AMS Holdings, Inc. changed its name to Astora Women's Health Holdings, LLC and subsequently merged into Astora Women's Health, LLC, also a Delaware Corporation. Astora Women's Health (formerly AMS' Women's Health Division, ultimately began to design, market, sell AMS, Inc.'s Pelvic Mesh Products. Astora Women's Health Holdings and Astora Women's Health were and are wholly owned subsidiaries of Endo Pharmaceuticals Holdings, Inc. (now known as Endo Health Solutions, Inc.) and/or Endo Pharmaceuticals, Inc.  Endo Pharmaceuticals Holdings, Inc. (now known as Endo Health Solutions, Inc.) is the parent company of Endo Pharmaceuticals, Inc.  Both Endo entities are Delaware corporations and wholly owned subsidiaries of Endo International, PLC,[1] a global

---

[1] In its Form 10-K for the fiscal year ending December 31, 2018, Endo International acknowledges the relationship it has with the other defendants, stating: "Vaginal Mesh. Since 2008, we and certain of **our subsidiaries**, including American Medical Systems Holdings, Inc. (subsequently

pharmaceutical company with United States Headquarters in Malvern, Pennsylvania. The Endo entities are sometimes collectively referred to herein as "Endo."

15.     On April 11, 2011, Endo issued a press release announcing its agreement to acquire AMS. Therein, Dave Holveck, President and Chief Executive Officer of Endo International, said:

> This acquisition is a great step in achieving Endo's core strategy. We are creating a company uniquely positioned to respond to the changing healthcare environment and the competitive, rapidly consolidating industry landscape. Through the acquisition of AMS, we will gain scale in devices and services, and will be positioned as a leading provider of healthcare solutions in the field of pelvic health, with a full spectrum of product offerings ranging from pharmaceuticals to medical devices.

16.     Under the terms of the merger agreement, which was approved by the Boards of Directors of both companies, Endo acquire 100 percent of the shares of AMS for $30.00 per share or a total cash consideration of $2.9 billion in cash, which includes the assumption and repayment of $312 million of AMS debt.

17.     On June 17, 2011, Endo completed the acquisition of AMS for approximately $2.4 billion in aggregate consideration, including $2.3 billion in cash paid for equity, $71.6 million related to existing AMS stock-based compensation awards and certain other amounts, at which time AMS became a wholly-owned subsidiary of ENDO. AMS's shares were purchased at a price of $30.00 per share.  The acquisition has been accounted for as a business combination (in accordance with ASC 805 Business Combinations) and, as such, the AMS assets acquired and liabilities assumed have been recorded at their respective fair values. The determination of fair value for the identifiable tangible and intangible assets acquired and liabilities assumed requires extensive use of accounting estimates and judgments.

18.     In reporting the completion of the acquisition of AMS, ENDO provided an Unaudited Pro Forma Condensed Combined Financial Statement which makes clear that ENDO purchased all of AMS's liabilities including all that may be related to products liability claims.

---

converted to Astora Women's Health Holding LLC and merged into Astora Women's Health LLC and referred to herein as AMS) and/or Astora, have been named as defendants in multiple lawsuits in various state and federal courts in the U.S...." (emphasis added).

The following representation in pertinent part was made regarding the accounting of ENDO's acquisition of AMS's product liability related liabilities:

> Reflects (1) an adjustment to remove AMS's $4.4 million product liability reserve. In accordance with ASC 805, the fair value of the pre-acquisition contingency related to product liability cannot be reasonably estimated or determined.

20.     On June 20, 2011, ENDO issued another press release in which it announced the completion of its acquisition of AMS. Therein, Endo announced that on April 11, 2011, it entered into a definitive agreement to acquire AMS, a leading provider of world-class devices and therapies for male and female pelvic health, for approximately $2.9 billion in cash.

21.     On August 9, 2011, the Associated Press reported that Endo advised that its medical device and service revenue totaled $76.3 million, of which $26.8 million came from American Medical Systems.

22.     On the same day, ENDO issued another press release stating in pertinent part:

> Our devices and services sales were $76.3 million for the second quarter and demonstrate our increased diversification. Revenues from our device and services segment include $26.8 million from our recent acquisition of American Medical Systems, (AMS), which furthers Endo's evolution from a product-driven company to a healthcare solutions provider. We believe that AMS strengthens Endo's core urology franchise, diversifies revenue and improves gross margin.

23.     The subject synthetic mesh system as designed, manufactured, marketed, distributed, sold and/or supplied by ENDO's predecessor, AMS and/or Astora Women's Health was defective as marketed due to inadequate warnings, instructions, labeling and/or inadequate testing in the presence of AMS and/or Astora Women's Health's knowledge of lack of pelvic health safety.

24.     In 2016, facing numerous lawsuits arising from its Pelvic Mesh Products, ENDO announced that it was closing its Astor Women's Health unit. Suketu Upadhyay, Executive Vice President of Endo International, said that although the company received bids for Astora, "by shutting down the business as opposed to selling it, we are able to reduce the potential for product

liability related to future mesh implants, which would not have been achievable in the event of a sale of the Astora business."

25. At all times herein mentioned, the parent companies participated in, authorized, ratified, approved, and/or directed the actions of their affiliated entities and/or the officers and/or directors of ENDO and/or ENDO's predecessor, AMS, AMS Holdings, and/or Astora Women's Health, participated in, authorized and/or directed the production and promotion of the aforementioned products when they knew of the hazards and dangerous propensities of said products, and thereby actively participated in the tortuous conduct that resulted in the injuries suffered by Plaintiff. Additionally, the surviving or acquiring corporations or limited liability companies are liable for the actions of the subsumed entities.

26. American Medical Systems, Inc, American Medical Systems Holding, Inc., Astora Women's Health, LLC, Endo Pharmaceuticals, Inc., Endo Pharmaceuticals Holdings, Inc., and Endo Health Solutions, Inc., are collectively referred to hereinafter as "AMS Defendants."

### The Pelvic Mesh Products

27. AMS Defendants promote their medical devices as devices intended to treat stress urinary incontinence ("SUI") and/or pelvic organ prolapse ("POP").

28. AMS Defendants designed, manufactured, packaged, labeled, marketed, sold, and distributed the Monarc Hammock ("the AMS Product") which was implanted in Plaintiff.

29. AMS Defendants' Pelvic Mesh Products, including the AMS Product implanted in Plaintiff, contain monofilament polypropylene mesh. Despite claims that polypropylene is inert, the scientific evidence shows that this material as implanted in Plaintiff is biologically incompatible with human tissue and promotes a negative immune response in a large subset of the population implanted with pelvic mesh products, including the products at issue herein. This

negative response promotes inflammation of the pelvic tissue and can contribute to the formation of severe adverse reactions to the mesh. When this mesh is inserted in the female body according to the manufacturers' instructions, it creates a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities.

30.     Surgical mesh products have been used to repair abdominal hernias since the 1950s. In the 1970s, gynecologists began using surgical mesh products that were designed for hernia repair for abdominal repair to surgically repair prolapsed organs. In the 1990s, gynecologists began using this surgical mesh for the surgical treatment of POP and SUI. Manufacturers, including AMS Defendants, began to modify the mesh used in hernia repair to be used as products specifically intended to correct POP and/or SUI. AMS Defendants sold pelvic mesh "kits" which can include not only the surgical mesh, but also tissue fixation anchors and insertion tools. The AMS Monarc is a Class II medical device.

31.     AMS Defendants sought and obtained FDA clearance (not approval) to market the Monarc under Section 510(k) of the Medical Device Amendment to the Food, Drug and Cosmetics Act.  Section 510(k) provides for marketing of a medical device if the device is deemed "substantially equivalent" to other predicate devices marketed prior to May 28, 1976. No formal review for safety or efficacy is required, and no formal review for safety or efficacy was ever conducted by AMS Defendants with regard to the Monarc.

32.     Defendants' Pelvic Mesh Products contain monofilament polypropylene mesh. These Pelvic Mesh Products were designed and intended to be permanently implanted into the human body. Despite claims that polypropylene is inert, the scientific evidence shows that this material as implanted in the Plaintiff is biologically incompatible with human tissue and promotes a negative immune response in a large subset of the population implanted with the Products. This

negative response promotes inflammation of the pelvic tissue and can contribute to the formation of severe adverse reactions to the mesh. This immune response also promotes degradation of the pelvic tissue and can contribute to the formation of severe adverse reactions to the mesh.

33.    Certain information was available in the medical literature regarding the dangers of polypropylene mesh and manufacturers had a duty to be aware and should have been aware of this literature, including:

a.    Shrinkage and bacteria lead to an evolving process and increased erosion. (Klinge U. Eur J Surg 1998; 164:965, Jacquetin B. Int Urogyn J 2009; 20:893, Tunn R. Ultrasound Obstetrics Gynecol 2007; 29:449).

b.    Polypropylene mesh has long been known to shrink. This is well supported by the literature. (Klinge U. Eur J Surg 1998; 164:965, Jacquetin B. Int Urogyn J 2009; 20:893, Tunn R. Ultrasound Obstetrics Gynecol 2007; 29:449). By 1998, polypropylene mesh was known to shrink 30-50%. This was subsequently confirmed in 2007. (Klinge U. Eur J Surg 1998; 164:965, Jacquetin B. Int Urogyn J 2009; 20:893, Tunn R. Ultrasound Obstetrics Gynecol 2007; 29:449). Predominate infection/inflammation was noted in 2007 in explanted polypropylene samples. (Yahi Y. Int Urogyn J 2007; 18(Suppl 1):S149).

c.    The weave of the mesh produces very small interstices which allow bacteria to enter and to hide from the host defenses designed to eliminate them. The bacteria can secrete an encasing slime (biofilm) which further serves to protect them from destruction by white blood cells and macrophages.

(Osterberg B. ActaChirScand1979; 145:431, Merritt K.   J BiomatAppl 1991; 5:185, An Y.  J Biomed Mater Res (ApplBiomat) 1998; 43:338).

d.      The large surface area promotes wicking of fluids and bacteria which provides a safe haven for bacteria which attach themselves to the mesh during the insertion process.  (Mahmoud W.  J Biomat Sci Polymer Ed 1996; 7:751, Klinge U.  J Biomed Mater Res 2002; 63:765, Vollebregt A. Int Urogyn J 2009; 20:1345).

e.      The size of the mesh placed equates to a large surface area with many places for bacteria to hide while being protected from host defenses.  (Mahmoud W.  J Biomat Sci Polymer Ed 1996; 7:751, Klinge U.  J Biomed Mater Res 2002; 63:765, Vollebregt A.  Int Urogyn J 2009; 20:1345).

f.      Polypropylene is impure:  There is no such thing as pure polypropylene. Polypropylene contains about 15 additional compounds which are leached from the polypropylene and are toxic to tissue which enhances the inflammatory reaction and the intensity of fibrosis. (Sternschuss G.  J Urol 2012; May 12 epub, Frostling H.   Scand J Work Environ Health 1984; 10:163).

g.      Prolene[TM] (polypropylene) was shown to be not inert in 1986 and again in 2003 with flaking and fissuring demonstrated by scanning electron microscopy which leads to degradation and release of toxic compounds. This enhances the inflammatory and fibrotic reactions.  (Coda A. Hernia 2003; 7:29, Jongebloed WL. Doc Ophthalmol 1986; 64:143–52).

h.     With the loss of polypropylene due to degradation, the surface area is greatly increased thus providing greater areas for bacterial adherence and more elution of toxic compounds from the polypropylene and also the freed toxic polypropylene itself, all of which increases the inflammatory reaction and intensity of fibrosis.   (Jongebloed W. Doc Ophth 1986; 64:143, Sternschuss G.  J Urol 2012; May 12 epub, Clave A.  Int Urogyn J 2010; 21:261).

34.     The polypropylene mesh used by AMS Defendants for their Pelvic Mesh Products also contracts as a result of the development of scar tissue exacerbated by the foreign body reaction. Polypropylene mesh is known to shrink by up to over 50% during healing.  When the transvaginal mesh shrinks during the normal healing process, the arms of the mesh pull on their anchoring points in the pelvic sidewall muscles, tending to pull these anchoring points and the attached muscle toward the midline.  In women with these transvaginal mesh implants, including Plaintiff herein, this pulling on the pelvic sidewall muscles causes pain at rest, during sexual intercourse, during defecation, and during normal daily activities like coughing, jumping and straining.  This aggravated pulling will cause new or worsening pain to the women in whom the product is implanted.  In addition, it is well established that nerves can become entrapped as a result of the chronic inflammatory response, traction, and fibrosis surrounding the mesh.

35.     On July 13, 2011, the FDA issued a Safety Communication wherein the FDA stated that "serious complications associated with surgical mesh for transvaginal repair of POP are not rare."

36.     The FDA Safety Communication also stated, "Mesh contraction (shrinkage) is a previously unidentified risk of transvaginal POP repair with mesh that has been reported in the

published scientific literature and in adverse event reports to the FDA." Reports in the literature associate mesh contraction with vaginal shortening, vaginal tightening and vaginal pain.

37.     In September 2011, the FDA acknowledged the need for additional data and noted in "Surgical Mesh For Treatment of Women with Pelvic Organ Prolapse and Stress Urinary Incontinence" that the literature and information developing on SUI repair with mesh "indicates that serious complications can occur…[and] a case can be made for additional premarket and/or post market studies to better address the risk/benefit of all mesh products used for SUI."

38.     After the 2011 FDA notification that mesh complications from POP repairs were "not rare," a 2013 article was published that stated: "as outlined in the FDA notifications, patients should be forewarned that some transvaginal mesh complications are life altering and might not always be surgically correctable. Furthermore, that study noted that "the women who received both MUS and TM represented a complicated surgical group. Fifteen women (43%) required MUS takedown concurrently with prolapse mesh excision. Two-thirds of these women had associated chronic pelvic pain and vaginal pain, in addition to their urinary symptoms."

39.     Defendants did not, and have not, adequately studied the extent of the risks associated with their Pelvic Mesh Products.

40.     In a December 2011 Joint Committee Opinion, the American College of Obstetricians and Gynecologists (ACOG) and the American Urogynecologic Society (AUGS) also identified physical and mechanical changes to the mesh inside the body as a serious complication associated with vaginal mesh, stating:  There are increasing reports of vaginal pain associated with changes that can occur with mesh (contraction, retraction, or shrinkage) that result in taut sections of mesh…Some of these women will require surgical intervention to correct the condition, and some of the pain appears to be intractable.

41.     The ACOG/AUGS Joint Committee Opinion also recommended, among other things, that "[p]elvic organ prolapse vaginal mesh repair should be reserved for high-risk individuals in whom the benefit of mesh placement may justify the risk."

42.     Plaintiff's injuries, as will be more fully established in Discovery, are reported in the FDA Safety Communication and in the ACOG/AUGS Joint Committee Opinion.

43.     The FDA Safety Communication further indicated that the benefits of using transvaginal mesh products instead of other feasible alternatives did not outweigh the associated risks. Specifically, the FDA Safety Communication stated: "it is not clear that transvaginal POP repair with mesh is more effective than traditional non-mesh repair in all patients with POP and it may expose patients to greater risk."

44.     Contemporaneously with the Safety Communication, the FDA released a publication titled "Urogynecologic Surgical Mesh: Update on the Safety and Effectiveness of Transvaginal Placement for Pelvic Organ Prolapse" (the White Paper). In the White Paper, the FDA noted that the published, peer-reviewed literature demonstrates that "[p]atients who undergo POP repair with mesh are subject to mesh-related complications that are not experienced by patients who undergo traditional surgery without mesh."

45.     The FDA summarized its findings from its review of the adverse event reports and applicable literature stating that it "has NOT seen conclusive evidence that using transvaginal placed mesh in POP repair improves clinical outcomes any more than traditional POP repair that does not use mesh, and it may expose patients to greater risk.

46.     The FDA White Paper further stated that, "these products are associated with serious adverse events…compounding the concerns regarding adverse events are performance data that fail to demonstrate improved clinical benefit over traditional non-mesh repair."

47.     In its White Paper, the FDA advises doctors to, *inter alia*, "[r]ecognize that in most cases, POP can be treated successfully without mesh thus avoiding the risk of mesh-related complications." The FDA concludes its White Paper by stating that it "has identified serious safety and effectiveness concerns over the use of surgical mesh for the transvaginal repair of pelvic organ prolapse."

48.     As is known to the AMS Defendants, the risks associated with POP repair are the same as SUI repair. However, the data regarding the magnitude and frequency of these known

risks are not as developed as the data on POP repair. The FDA recognized this, as demonstrated by its Section 522 Orders issued in January of 2012 to manufacturers of pelvic mesh products used to treat SUI.

49.     In September 2011, the FDA acknowledged the need for additional data and noted in "Surgical Mesh For Treatment of Women with Pelvic Organ Prolapse and Stress Urinary Incontinence" that the literature and information developing on SUI repair with mesh "indicates that serious complications can occur…[and] a case can be made for additional premarket and/or post market studies to better address the risk/benefit of all mesh products used for SUI."

50.     AMS Defendants did not, and have not, adequately studied the extent of the risks associated with the AMS Products, including the product implanted in Plaintiff. In January 2012, the FDA recognized the risk to women and mandated additional studies to further investigate these risks.

51.     On April 16, 2019, the FDA ordered all manufacturers of surgical mesh intended for transvaginal repair of anterior compartment prolapse (cystocele) to stop selling and distributing their products immediately. In fact, the FDA has determined that the manufacturers have not demonstrated reasonable assurance of safety  and effectiveness for these devices, which is the premarket standard that now applies to them since the agency reclassified them into class III (high risk) in 2016.[2]

52.     AMS Defendants knew or should have known about the AMS Pelvic Mesh Products' risks and complications identified in the FDA Safety Communication, ACOG/AUGS Joint Committee Opinion, and the FDA Advisory that addressed the sales of transvaginal mesh implants for pelvic organ prolapse.

53.     AMS Defendants knew or should have known that the AMS Pelvic Mesh Products unreasonably exposed patients to the risk of serious harm while conferring no benefit over available feasible alternatives that do not involve the same risks.

---

[2] www.fda.gov/medical-devices/implants-and-prosthetics/urogynecologic-surgical-mesh-implants (last visited 6/18/2019).

54.     The scientific evidence shows that the material from which the AMS Pelvic Mesh Products, including the Monarc which was implanted in Plaintiff, are made is biologically incompatible with human tissue and promotes a negative immune response in a large subset of the population implanted with the AMS Defendants' products, including Plaintiff.

55.     This negative response promotes inflammation of the pelvic tissue and contributes to the formation of severe adverse reactions to the mesh, such as those experienced by Plaintiff.

56.     The FDA defines both "degradation" and "fragmentation" as "device problems" to which the FDA assigns a specific "device problem code." "Material Fragmentation" is defined as an "[i]ssue associated with small pieces of the device breaking off unexpectedly" and "degraded" as an "[i]ssue associated with a deleterious change in the chemical structure, physical properties, or appearance in the materials that are used in device construction." The AMS Pelvic Mesh Products were unreasonably susceptible to degradation and fragmentation inside the body.

57.     The AMS Pelvic Mesh Products were unreasonably susceptible to shrinkage and contraction inside the body. Before the devices at issue left control of Defendants and/or prior to the sales and/or implantation of the products at issue, Defendants knew or should have known of this serious risk related to shrinkage and contraction of their permanent synthetic vaginal mesh products and warned physicians and patients.

58.     The AMS Pelvic Mesh Products were unreasonably susceptible to "creep" or the gradual elongation and deformation when subject to prolonged tension inside the body. Before the devices at issue left control of Defendants and/or prior to the sales and/or implantation of the products at issue, Defendants knew or should have known that their products were unreasonably susceptible to "creep" or the gradual elongation and deformation when subject to prolonged tension inside the body.

59.     To this day, the Monarc has been marketed to the medical community and to patients as safe, effective, and reliable medical devices, implanted by safe and effective minimally invasive surgical techniques, and as safer and more effective as compared to available feasible alternative treatments of stress urinary incontinence and pelvic organ prolapse, such as use of

native tissue, and other competing products.

60.     A woman who elects to have her SUI or POP surgically treated has several options. SUI can be corrected through traditional abdominal surgery using sutures to attach the urethra to a ligament in the pelvis (known as the "Burch procedure") or the use of autologous slings placed under the urethra to provide support. POP can be corrected through abdominal surgery and using autologous tissue, biologic, composite, or synthetic material.

61.     AMS Defendants omitted and downplayed the risks, dangers, defects, and disadvantages of the AMS Products, and advertised, promoted, marketed, sold, and distributed the Monarc as safe medical devices when AMS Defendants knew or should have known that the Monarc was not safe for its intended purposes, and that the Monarc would cause, and did cause, serious medical problems, and in some patients, including Plaintiff, catastrophic injuries. Further, while some of the problems associated with the were made known to physicians, the full magnitude, severity, and frequency of these problems were not disclosed and were hidden from physicians, including Plaintiff's physicians.

62.     Contrary to AMS Defendants' representations and marketing to the medical community and to the patients themselves, the Monarc has high rates of failure, injury, and complications, fail to perform as intended, require frequent and often debilitating re-operations, and have caused severe and irreversible injuries, conditions, and damage to a significant number of women, including Plaintiff, making these products defective under the law.

63.     The specific nature of the Monarc's defects includes, but is not limited to, the following:

        a.     The use of polypropylene in the Monarc and the adverse tissue reactions, host defense response, and immune reactions that result from such material, causing adverse reactions and permanent injuries including but not limited to painful recurrent erosions and associated intractable pain;

b.      The design of the Monarc to be inserted into and through an area of the body that is blood vessel rich, nerve dense, and bacteria laden leading to excessive blood loss and vascular damage, permanent nerve injury and associated chronic, intractable neuropathic pain, contaminated permanently-implanted mesh causing chronic infections, subclinical infections and biofilms, enhanced chronic inflammatory response, chronic wound healing with tissue destruction, as well as numerous other adverse     reactions and serious and permanent injuries;

c.      The design of the Monarc to be inserted into and through an area of the body with high levels of bacteria that can adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

d.      Biomechanical issues with the design of the Monarc  including, but not limited to, the propensity of the Monarc to contract or shrink inside the body, that in turn cause surrounding tissue to be inflamed, become fibrotic, and contract, resulting in serious and permanent injury;

e.      The use and design of arms of the Monarc, which, when placed in the women, are likely to pass through contaminated spaces and that can injure major nerve routes in the pelvic region;

f.      The procedure to place the Monarc requires blindly placing the arms of the device through the obturator canal, into the groin, and can injure major nerves that contribute to sexual function, contribute to mobility, contribute to bowel and bladder function and can cause chronic pain;

g.      The propensity of the Monarc for "creep," or to gradually elongate and deform when subject to prolonged tension inside the body;

h.      The inelasticity of the Monarc, causing the products to be improperly mated to the delicate and sensitive areas of the vagina and pelvis where they are implanted, and causing pain upon normal daily activities that involve movement in the pelvic region (e.g. intercourse, defecation, or walking);

h.      The propensity of the Monarc for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction, and results in continuing injury over time; and

i.      The creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the mesh is implanting according to the manufacturers' instructions.

72.     The Monarc is also defective due to AMS Defendants' failure to adequately warn or instruct Plaintiff and/or her health care providers of subjects including, but not limited to, the following:

a.      The propensities of the Monarc to contract, retract, and/or shrink inside the body;

b.      The propensities of the Monarc for degradation, fragmentation, and/or creep;

c.      The inelasticity of the Monarc that prevents proper mating with the pelvic floor and vaginal region;

d.      The frequency and manner of mesh erosion or extrusion;

e.      The risk of chronic inflammation resulting from the Monarc;

f.      The risk of chronic infections resulting from the Monarc;

g.      The risk of permanent vaginal or pelvic scarring as a result of the Monarc;

      h.     The risk of de novo urinary dysfunction;

      i.     The risk of de novo dyspareunia or painful sexual intercourse;

      j.     The risk of recurrent, intractable pelvic pain and other pain resulting from the Monarc;

      k.     The need for corrective or revision surgery to adjust or remove the Monarc;

      l.     The severity of complications that could arise as a result of implantation of the Monarc;

      m.     The hazards associated with the Monarc including injury to the obturator nerve and pudendal nerve or other permanent nerve damage;

      n.     The defects of the Monarc described herein;

      o.     Treatment of stress urinary incontinence with the Monarc is no more effective than feasible available alternatives;

      p.     Treatment of stress urinary incontinence with the Monarc exposes patients to greater risk than feasible available alternatives;

      q.     Treatment of stress urinary incontinence with the Monarc makes future surgical repair more difficult than the feasible available alternatives;

      r.     Use of the Monarc puts the patient at greater risk of requiring additional surgery than feasible available alternatives;

      s.     Removal of the Monarc due to complications may involve multiple surgeries and may significantly impair the patient's quality of life; and

      t.     Complete removal of the Monarc may not be possible and may not result in complete resolution of the complications, including pain.

73.     AMS Defendants under reported and continue to underreport information about the propensity of the Monarc to fail and to cause injuries, and complications, and have made unfounded representations regarding the efficacy and safety of the Monarc through various means and media.

75.     AMS Defendants failed to design and establish a safe, effective procedure for removal of the Monarc or to determine if a safe and effective procedure for removal of products exists.

76.     Feasible and suitable alternatives to the Monarc, including use of native or biologic tissue, have existed at all times relevant and do not present the same frequency and/or severity of risks as the Monarc.

77.     The Monarc was at all times utilized and implanted in a manner intended and foreseeable to the AMS Defendants, as AMS Defendants generated the instructions for use, created the procedures for implanting the devices, and trained the implanting physician(s).

78.     AMS Defendants knowingly provided incomplete and insufficient training and information to physicians, including Plaintiff's implanting physician(s), regarding the use of their Pelvic Mesh Products and the aftercare of patients implanted with those products.

79.     The injuries, conditions, and complications suffered by numerous women around the world who have been implanted with the Monarc include, but are not limited to, erosion, mesh contraction, infection, fistula, inflammation, scar tissue, organ perforation, dyspareunia (pain during sexual intercourse), blood loss, neuropathic pain, and other acute and chronic nerve damage and pain, pudendal nerve damage, obturator nerve damage, pelvic floor damage, and chronic pelvic pain.

80.     In many cases, including Plaintiff's, women have been forced to undergo extensive
medical treatment including, but not limited to, operations to locate and remove mesh, operations
to attempt to repair pelvic organs, tissue, and nerve damage, the use of pain control and other
medications, injections into various areas of the pelvis, spine, and the vagina, and operations to
remove portions of the female genitalia.

81.     The medical and scientific literature studying the effects of mesh products like the
Monarc, like the product implanted in Plaintiff, has examined each of these injuries, conditions,
and complications, and has reported that they are causally related to mesh products.

82.     Removal of contracted, eroded and/or infected mesh can require multiple surgical
interventions for removal of mesh and results in scarring on fragile compromised pelvic tissue and
muscles.

83.     At all relevant times herein, AMS Defendants continued to promote the Products
as safe and effective even when no clinical trials had been done supporting long- or short-term
efficacy or safety.

84.     In doing so, AMS Defendants failed to disclose the known risks and failed to warn
of known or scientifically knowable dangers and risks associated with the Monarc, including the
magnitude and frequency of these risks.

85.     At all relevant times herein, AMS Defendants failed to provide sufficient warnings
and instructions that would have put Plaintiff and the general public on notice of the dangers and
adverse effects caused by implantation of the Monarc.

86.     The Monarc, as designed, manufactured, distributed, sold and/or supplied by AMS
Defendants, was defective as marketed due to inadequate warnings, instructions, labeling and/or
inadequate testing in the presence of AMS Defendants' knowledge of the risks.

87.     The Monarc is designed to be placed blindly close to the obturator nerve. This intended placement causes or substantially contributes to obturator neuralgia.

88.     The Monarc is designed to be placed blindly and pierces and passes through the obturator internus muscle and obturator membrane which is close ot the pudendal nerve. This intended placement causes or substantially contributes to pudendal neuralgia.

89.     The Monarc was designed to be placed into the groin. This placement causes or substantially contributes to hip adductor myalgia and/or obturator neuralgia.

90.     The Monarc was designed to be placed on or about the pelvic floor piercing muscles of the pelvic floor. This intended placement causes tension that causes or substantially contributes to pelvic floor myalgia.

91.     The Monarc was designed to be placed on or about the pelvic floor adjacent to the vagina, the urethra, the bladder, and the rectum. This intended placement causes or substantially contributes to causing pelvic floor myalgia, painful bladder filling, chronic pelvic pain, impaired mobility, impaired sexual function, dyspareunia, impaired bladder function, recurrent infections, recurrent incontinence, impaired bowel function, and impaired mobility related to chronic inflammatory response, scar plate formation, adhesions, and erosions and migration of the product.

92.     The Monarc is designed to require blindly placing the arms of the sling and does not account for anatomic variations of the nerves which places the nerve and their branches in peril for direct injury and injury over time.

93.     The AMS Defendants did not study the anatomic variations now known for the pudendal, ilioinguinal, and obturator nerves.

### Facts as to Plaintiff

94.     On September 12, 2013 at St. Joseph's Regional Medical Center in Lewiston, Idaho, Plaintiff Mary Schneider was surgically implanted by Dr. Alex Watson with the Monarc Hammock System, a medical device designed, manufactured, and marketed by AMS Defendants, for treatment of stress urinary incontinence.  Although the system was intended to treat urinary incontinence, neither Plaintiff nor her healthcare providers were warned that the Monarc was defective and negligently designed and manufactured, as discussed further herein.

95.     Plaintiff's treating physicians implanted the Monarc properly and appropriately and for its intended purpose.

96.     The Monarc implanted in Plaintiff was in the same or substantially similar condition as it was when it left AMS Defendants' possession, and in the condition directed by and expected by AMS Defendants.

97.     On or about August 21, 2019, Plaintiff was diagnosed with complications caused by the defective mesh and surgical revision was recommended.  Plaintiff intends to pursue surgery and other treatment, as recommended.

98.     Plaintiff could not have reasonably discovered the occasion, manner and/or means by which Defendants' breach of duty occurred until within two years of the filing of this complaint.  Further, Plaintiff did not and, exercising reasonable diligence, including consultation with medical professionals, could not discover the existence of her legal cause of action or the injuries caused by Defendants' breach of duty and/or defective products until within two years of the filing of this complaint.

99.     Before August 2019, Plaintiff was diligent regarding her health care and saw various medical professionals who suggested that she may be suffering from a variety of maladies

for which she was examined and tested, including urinary tract infections, auto immune conditions, ovarian cysts, and fibromyalgia. Until August 2019, none of her treating healthcare providers suggested that the Pelvic Mesh Product might be causing her issues.

100.    Defendants continue to deny that their products are defective or cause injuries such as those suffered by Plaintiff and Defendants continue to manufacture, market, and sell all or some of their Pelvic Mesh Products. Any applicable statute of limitations has been tolled by the knowing and active concealment and denial of material facts known by Defendants when Defendants had a duty to disclose.

101.    Neither Plaintiff nor her healthcare providers were warned that the Monarc was dangerous, even when used exactly as intended by AMS Defendants. To the contrary, Defendants promoted, marketed and sold the type of transvaginal mesh devices implanted in Plaintiff (and thousands of women like Plaintiff) to healthcare providers as a safe alternative to other procedures that did not incorporate the Defendants' products.

102.    As a direct and proximate result of being surgically implanted with Defendants' defective transvaginal mesh devices, Plaintiff has suffered, and continues to suffer, debilitating injuries, including but not limited to mesh erosion necessitating surgical removal, chronic pelvic pain, perineal pain, and neuropathic pain potentially related to pudendal/obturator neuralgia. Plaintiff brings this suit for damages related to those injuries.

103.    The Monarc was designed to be placed blindly, close to the nerves in the pelvis. This placement may have caused MARY SCHNEIDER to suffer neuropathic pain and potentially pudendal neuralgia and/or obturator neuralgia.

104.    The Monarc was designed to be permanently implanted into a woman's body yet the product changes after implantation; it contracts over time which *inter alia,* can pull or compress

nerves, muscles, and other soft tissues important for sexual function, mobility, bowel function, and bladder function. These product changes likely have occurred while the product is implanted in Plaintiff.

105.    The Monarc was designed to be permanently implanted into a woman's body yet the product changes after implantation; it contracts over time which can pull, cause fibrosis of muscles, adhesions between tissues, an inflammation which impair sexual function, impaired mobility, impaired bowel and bladder function, and chronic pelvic pain. These changes likely have occurred while the products is implanted in Plaintiff.

106.    As a direct and proximate result of Defendants' defective product, MARY SCHNEIDER has permanent impairment that more likely than not may include any of the following diagnoses: dyspareunia, impaired gait secondary to muscle pain and direct injury to muscles, pelvic floor tension myalgia, vaginal and vulva allodynia, anorectal pain, recurrent incontinence, recurrent urinary tract infection, bowel and bladder dysfunction, chronic cystitis, interstitial cystitis, vaginal erosion, hip adductor myalgia, potentially pudendal neuralgia, potentially obturator neuralgia, potentially complex regional pain syndrome, and need for further surgeries.

107.    The risk of serious injuries was known or should have been known to AMS Defendants, but in spite of these risks, AMS Defendants continued to market the Monarc for transvaginal use to physicians and patients, including Plaintiff and Plaintiff's healthcare providers, without adequate warnings.

108.    Had AMS Defendants properly disclosed the risks associated with the Monarc for transvaginal use, Plaintiff would not have agreed to treatment with these devices.

109.    The injuries suffered by Plaintiff were caused by the wrongful acts, omissions, and fraudulent representations of AMS Defendants.

110.    As a direct and proximate result of having the Monarc implanted in her body, Plaintiff MARY SCHNEIDER has experienced significant mental and physical pain and suffering, has sustained permanent injury which includes or more likely than not may include any of the following: pudendal neuralgia, obturator neuralgia, pelvic floor tension myalgia, hip adductor myalgia, complex regional pain syndrome, erosion, recurrent urinary tract infections, interstitial cystitis, chronic dyspareunia, bowel and bladder dysfunction, and anorectal pain, and has undergone medical treatment, surgical procedure(s) the defective and dangerous devices and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

## FIRST CAUSE OF ACTION

### Strict Liability – Failure to Warn

111.    Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

112.    AMS Defendants manufactured, sold and/or distributed the Monarc to Plaintiff's healthcare providers to be used for the treatment of stress urinary incontinence and/or pelvic organ prolapse.

113.    AMS Defendants' designs, manufacturing processes and the raw materials used for the Pelvic Mesh Product resulted in product defects.

114.    At all times mentioned herein, the Monarc was and is dangerous and presented a substantial danger to patients who were implanted with the Pelvic Mesh Product, and these risks

and dangers were known or knowable at the time of distribution and implantation in the Plaintiff. Ordinary consumers would not have recognized the potential risks and dangers the Monarc posed to pelvic reconstruction patients because its uses were specifically promoted to improve the health of such patients. The Monarc was used in a way reasonably foreseeable to Defendants by Plaintiff and Plaintiff's healthcare providers. Defendants knew or should have known of the defective condition, characteristics and risks associated with said products, as previously set forth herein. Defendants consciously disregarded the substantial risk of harm, as AMS Defendants failed to provide warnings of such risks and dangers to Plaintiff as described herein, unlawfully concealing the dangerous problems associated with implantation of the Pelvic Mesh Products, and continuing to market, produce, sell and distribute the Pelvic Mesh Products.

115.    Plaintiff would not have consented to use of AMS Defendants' Monarc had Defendants given adequate warnings to Plaintiff and Plaintiff's implanting physicians.

116.    As a direct and proximate result of the implantation of the Monarc, Plaintiff suffered debilitating injuries which includes or more likely than not may include any of the following: pudendal neuralgia, catastrophic pain syndrome, obturator neuralgia, complex regional pain syndrome, pelvic floor tension myalgia, dyspareunia, recurrent urinary tract infection, permanent disfigurement, hip adductor myalgia, anorectal pain, erosion, bowel and bladder dysfunction, loss of mobility, and the need for additional surgery and therapeutic treatments.

117.    In doing the acts herein described, the AMS Defendants acted with oppression, fraud and malice, and Plaintiff intends to request punitive damages to deter AMS Defendants and others from engaging in similar conduct in the future. Said wrongful conduct was done with advance knowledge, authorization and/or ratification of an officer, director and/or managing agent of the AMS Defendants.

118.    At all times herein mentioned, the Monarc was being used as intended by AMS Defendants and in a manner foreseeable to AMS Defendants.

119.    As a result of the defective condition of the Monarc, and the lack of sufficient warnings, Plaintiff has suffered the injuries and damages alleged herein.

WHEREFORE, said Plaintiff prays for judgment against AMS Defendants, as hereinafter set forth.

**SECOND CAUSE OF ACTION**

**Strict Liability – Manufacturing Defect**

120.    Additionally, or in the alternative, if same be necessary, Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

121.    At all times herein mentioned, AMS Defendants' Monarc was prescribed and used as intended by AMS Defendants and in a manner reasonably foreseeable to AMS Defendants.

122.    The Monarc was defective at the time of manufacture, development, production, testing, inspection, endorsement, prescription, sale and distribution, and at the time they left the possession of the AMS Defendants, in that, and not by way of limitation, the products differed from the AMS Defendants' intended result and intended design and specifications, and from other ostensibly identical units of the same product line.

123.    Defendants' manufacture, development, production, testing, inspection, endorsement, prescription, sale and distribution of the Pelvic Mesh Products was a substantial factor in causing Plaintiff's injuries as described herein.

124.    As a proximate and legal result of the defective condition of the Monarc, Plaintiff was caused to suffer and will continue to suffer the herein described injuries and damages.

WHEREFORE, said Plaintiff prays for judgment against AMS Defendants, as hereinafter set forth.

## THIRD CAUSE OF ACTION

### Strict Liability – Design Defect

125.    Additionally, or in the alternative, if same be necessary, Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

126.    The Monarc was designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or failed to inspect, labeled, advertised, promoted, marketed, supplied, licensed, distributed, wholesaled, and sold by AMS Defendants.

127.    The Monarc was manufactured, licensed, supplied, and/or placed into the stream of commerce by AMS Defendants were defective in that:

    a.      The foreseeable risks exceeded the benefits associated with the Monarc, design or formulation;

    b.      They contained inadequate post-marketing warnings or instructions; and

    c.      They were more dangerous than would be expected or appreciated by an ordinary consumer.

    d.      The Monarc that were manufactured, supplied, and/or placed into the stream of commerce by AMS Defendants were more dangerous than an ordinary customer would expect, and more dangerous than other Products or procedures available to treat stress urinary incontinence, pelvic organ prolapse and/or rectocele repair.

    e.      The design defects in AMS Defendants' Monarc existed at the time when the Monarc left Defendant's control.

f.      AMS Defendants knew that the Monarc was to be purchased and used without inspection for defects.

g.      The Monarc was and are unsafe for their intended and foreseeable uses by reason of defects in the design so that the Monarc would not safely serve their purpose but would instead expose the users of the Monarc to incur serious injuries.

h.      Plaintiff used the Monarc in a reasonably foreseeable manner.

i.      AMS Defendants designed the Monarc defectively, causing the Monarc to fail to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

130.    As a direct and proximate result of the aforementioned defects in the design of the Monarc, Plaintiff sustained the injuries and damages set forth herein.

WHEREFORE, said Plaintiff prays for judgment against AMS Defendants., as hereinafter set forth.

## FOURTH CAUSE OF ACTION

### Negligence

131.    Additionally, or in the alternative, if same be necessary, Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs of this Complaint as if fully set forth herein and further allege as follows:

132.    At all times herein mentioned, AMS Defendants were and is engaged in the business of researching, manufacturing, licensing, fabricating, designing, labeling, distributing, using, supplying, selling, marketing, warranting, packaging and advertising the Monarc.

133.    AMS Defendants owed to Plaintiff and the public a duty to act reasonably and to exercise ordinary care in pursuit of the activities mentioned above, and AMS Defendants breached said duty of care.

134.    At all times relevant hereto, AMS Defendants owed to Plaintiff and the public a duty to act reasonably and to exercise ordinary care with respect to the safe, legal, and proper manufacture, license, design, formulation, distribution, production, processing, assembly, testing, inspection, research, marketing, labeling, packaging, preparation for use, issuance of warnings with respect to promotion, advertising, sale, and safety monitoring of the Monarc, and to adequately test and warn of the risk and dangers of the Monarc, both before and after sale.

135.    Additionally, AMS Defendants owed to Plaintiff and the public a duty to provide accurate, reliable, and completely truthful information regarding the safety and any dangerous propensities of the Monarc manufactured, used, distributed, and/or supplied by them and to provide accurate, reliable, and completely truthful information regarding the failure of the Monarc to perform as intended or as an ordinary consumer would expect.

136.    At all times relevant hereto, AMS Defendants breached the aforementioned duties in that Defendants negligently and carelessly manufactured, fabricated, designed, licensed, produced, compounded, assembled, inspected or failed to inspect, tested or failed to test, inadequately warned or failed to warn of the health hazards, labeled, distributed, handled, used, supplied, sold, marketed, warranted, packaged, promoted, and advertised the Monarc in that said Monarc caused, directly and proximately, the injuries of Plaintiff through failure of the Monarc to perform as intended or as an ordinary consumer would expect.

137.    AMS Defendants' negligent manufacturing process and the raw materials used for AMS Defendants' Monarc resulted in product defects.

138.    The acts of AMS Defendants constitute violations of the duty of ordinary care and skill owed by AMS Defendants to Plaintiff.

139.    Plaintiff used and was implanted with AMS Defendants' Monarc referred herein in a manner that was reasonably foreseeable.

140.    As the direct and proximate result of AMS Defendants' negligent breach of their aforementioned duties with respect to the Monarc, Plaintiff suffered the injuries and damages alleged herein.

WHEREFORE, said Plaintiff prays for judgment against AMS Defendants as hereinafter set forth.

## FIFTH CAUSE OF ACTION

### Breach of Implied Warranty

141.    Additionally, or in the alternative, if same be necessary, Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

142.    AMS Defendants impliedly warranted to the Plaintiff, her prescribing physicians and healthcare providers, the medical scientific, pharmaceutical and health communities, the FDA, and the public, in general, that the Monarc was of merchantable quality and safe and fit for the particular purpose for which the Monarc was intended and sold.

143.    AMS Defendants further impliedly warranted to the Plaintiff, her prescribing physicians and healthcare providers, the medical scientific, pharmaceutical and health communities, the FDA, and the public, in general, that the Monarc was of merchantable quality and safe and fit for ordinary use.

144.    Plaintiff and her physicians and healthcare providers were, and remain, unskilled in the research, design, and manufacture of the Monarc and reasonably relied on the skill, judgment and implied warranty of AMS Defendants in using the aforementioned Monarc.

145.    AMS Defendants breached its warranties in that the Monarc was neither safe for their intended use nor of merchantable quality, as warranted by AMS Defendants, in that the Monarc had dangerous propensities and unknown or knowable side effects when put to their intended use and would cause severe injuries to the user, which propensities and side effects were known or knowable but were not warned of by AMS Defendants.

146.    After Plaintiff was made aware her injuries were a result of the aforesaid Monarc, AMS Defendants had ample and sufficient notice of breach of said warranty.

147.    As a result of the aforementioned breach of implied warranties by AMS Defendants, Plaintiff suffered injuries and damages as alleged herein.

WHEREFORE, said Plaintiff prays for judgment against AMS Defendants as hereinafter set forth.

## SIXTH CAUSE OF ACTION

### Breach of Express Warranty

148.    Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs of this Complaint as if fully set forth herein and, additionally or in the alternative if same be necessary, further alleges as follows:

149.    AMS Defendants expressly warranted to Plaintiff and/or their authorized agents or sales representatives, in publications, and other communications intended for medical patients, and the general public, that the defective Monarc was safe, effective, fit and proper for their intended use.

150.    Plaintiff and Plaintiff's physicians reasonably relied upon the skill and judgment of AMS Defendants, and upon said express warranty, in using the aforesaid Monarc. The warranty and representations were untrue in that the product caused severe injury to Plaintiff and were unsafe and, therefore, unsuited for the use in which they were intended and caused Plaintiff to sustain damages and injuries herein alleged.

151.    Through sale of the Pelvic Mesh Products, Defendants are merchants pursuant to Section 2-314 of the Uniform Commercial Code.

152.    As soon as the true nature of the Monarc, and the fact that the warranty and representations were false, were ascertained, said AMS Defendants had ample and sufficient notice of the breach of said warranty.

153.    As a result of the aforementioned breach of express warranties by AMS Defendants, Plaintiff suffered injuries and damages as alleged herein.

WHEREFORE, said Plaintiff prays for judgment against AMS Defendants as hereinafter set forth.

## SEVENTH CAUSE OF ACTION

### Fraud

154.    Additionally, or in the alternative, if same be necessary, Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

155.    AMS Defendants falsely and fraudulently represented to Plaintiff, her physicians, and to members of the general public that the aforesaid Monarc was safe, effective, reliable, consistent, and better than the other similar pelvic repair procedures when used in the manner intended by the manufacturer. The representations by said AMS Defendants were, in fact, false.

The true facts include, but are not limited to, that the aforesaid Products were not safe to be used for treatment of urinary incontinence, and pelvic organ prolapse, and were, in fact, dangerous to the health and body of Plaintiff.

156.    When the AMS Defendants made these representations, it knew that they were false. AMS Defendants made said representations with the intent to defraud and deceive Plaintiff, and with the intent to induce Plaintiff to act in the manner herein alleged, that is, to use the aforementioned products for treatment of urinary incontinence and pelvic organ prolapse.

157.    At the time AMS Defendants made the aforesaid representations, Plaintiff took the actions herein alleged; Plaintiff and her physicians were ignorant of the falsity of these representations and reasonably believed them to be true. In reliance upon said representations, Plaintiff was induced to, and did, use the aforesaid Monarc as herein described. If Plaintiff had known the facts regarding the safety of the Monarc, she would not have taken such action. The reliance of Plaintiff and her physicians upon AMS Defendants' representations were justified because said representations were made by individuals and entities that appeared to be in a position to know the true facts.

158.    As a result of AMS Defendants' fraud and deceit, Plaintiff was caused to sustain the herein described injuries and damages.

159.    In doing the acts herein alleged, the AMS Defendants acted with oppression, fraud, and malice, and Plaintiff intends to ask for punitive damages to deter AMS Defendants and others from engaging in similar conduct in the future. Said wrongful conduct was done with advance knowledge, authorization and/or ratification of an officer, director and/or managing agent of AMS Defendants.

160.    AMS Defendants' fraudulent concealment tolled the statute of limitations because only AMS Defendants knew the true dangers associated with the use of the Monarc as described herein. AMS Defendants did not disclose this information to the Plaintiff, her healthcare providers, the health care community and the general public. Without full knowledge of the dangers of the Monarc Plaintiff could not, through reasonable diligence, discover that she had a valid claim.

161.    As a direct and proximate result of AMS Defendants' fraud, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

WHEREFORE, said Plaintiff prays for judgment against AMS Defendants as hereinafter set forth.

## EIGHTH CAUSE OF ACTION

### Negligent Misrepresentation

162.    Additionally, or in the alternative, if same be necessary, Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs of this Complaint as if fully set forth herein and further allege as follows:

163.    AMS Defendants from the time that the Monarc was first tested, studied, researched, first manufactured, marketed and distributed, and up to the present, made false representations, as previously set forth herein, to the Plaintiff, her prescribing physicians and healthcare providers, the medical, scientific, pharmaceutical and healthcare communities, and the public in general, including, but not limited to, the misrepresentation that the Monarc was safe, fit, and effective for the treatment of pelvic organ prolapse and stress urinary incontinence.

164.   Defendants owed a duty to the Plaintiff, her prescribing physicians and healthcare providers, the medical, scientific, pharmaceutical and healthcare communities, and the public in general, to accurately and truthfully represent the risks of the Pelvic Mesh Products. Defendants breached that duty by misrepresenting and/or failing to adequately warn Plaintiff, her prescribing physicians and healthcare providers, the medical, scientific, pharmaceutical and healthcare communities, and the public in general about the risks of the Pelvic Mesh Products, which Defendants knew or in the exercise of reasonable diligence should have known.

165.   The foregoing representations by AMS Defendants were in fact false in that the Monarc are not, and at all relevant times alleged herein, were not safe, fit, and effective for the treatment of pelvic organ prolapse, stress urinary incontinence and/or cystocele, the use of the Monarc is hazardous to health, and the Monarc have a significant propensity to cause serious injuries to users including, but not limited to, the injuries suffered as described herein by Plaintiff. The foregoing misrepresentations by AMS Defendants were made with the intention of inducing reliance and inducing the purchase and implantation of Monarc.

166.   In reliance on the misrepresentations of AMS Defendants, Plaintiff and her prescribing physicians and healthcare providers were induced to purchase and use the Monarc. If they had known of the true facts and the facts misrepresented by AMS Defendants, they would not have used the Monarc, and their reliance upon AMS Defendants' misrepresentations was justified because such misrepresentations were made and conducted by individuals and entities that were in a position to know the true facts.

167.   As a direct and proximate result of the negligent misrepresentation of the facts set forth above, Plaintiff sustained injuries and damages as set forth herein.

WHEREFORE, Plaintiff prays for judgment against AMS Defendants as hereinafter set forth.

### NINTH CAUSE OF ACTION

#### Intentional Misrepresentation

168.    Additionally, or in the alternative, if same be necessary, Plaintiff re-alleges and incorporates by reference each of the foregoing paragraphs of this Complaint as if fully set forth herein and further alleges as follows:

169.    At all times mentioned herein, AMS Defendants had the duty and obligation to disclose to Plaintiff and to her physicians, the true facts concerning the Monarc, that is, that said Monarc was dangerous and defective, lacking efficacy for their purported use and lacking safety in normal use, and how likely they were to cause serious consequences to users including permanent and debilitating injuries. AMS Defendants made the affirmative representations as set forth above to Plaintiff and her physicians and the general public prior to the date the Monarc was implanted in Plaintiff, while concealing material facts.

170.    At all times relevant hereto, AMS Defendants conducted a sales and marketing Campaign to promote the sale of the Monarc and willfully deceived the Plaintiff, her prescribing physicians and healthcare providers, the medical, scientific, pharmaceutical and healthcare communities, and the public in general as to the health risks and consequences of the use of the Monarc. In connection therewith, Defendants failed to exercise reasonable care and/or competence in communicating accurate and full information regarding the risks of their products.

171.    AMS Defendants made the foregoing misrepresentations without any reasonable ground for believing them to be true. These misrepresentations were made directly by AMS Defendants, by sales representatives, detail persons and other authorized agents of said Defendant,

and in publications and other written materials directed to the Plaintiff, her prescribing physicians and healthcare providers, the medical, scientific, pharmaceutical and healthcare communities, and the public in general with the intention of inducing reliance and the purchase and implantation of the Monarc.

172.    At all times herein mentioned, AMS Defendants willfully and maliciously concealed facts as set forth above from Plaintiff and her physicians, with the intent to defraud as herein alleged.

173.    At all times herein mentioned, neither Plaintiff nor her physicians were aware of the facts set forth above, and had they been aware of said facts, they would not have reasonably relied upon said representations of safety and efficacy and utilized the Monarc for correction of urinary incontinence, pelvic organ prolapse, vaginal vault prolapse and rectocele. Defendant's misrepresentations were a substantial fact in Plaintiff agreeing to utilize the Monarc for correction of her medical conditions.

174.    As a result of the concealment of the facts set for the above, Plaintiff sustained injuries and damages as set forth herein.

175.    The herein-described conduct of said AMS Defendants was willful, malicious, fraudulent, outrageous and in conscious disregard and indifference to the safety and health of patients with pelvic medical conditions, such as stress urinary incontinence or pelvic organ prolapse. Plaintiff, for the sake of example and by way of punishing said AMS Defendants, intends to ask for punitive damages according to proof.

WHEREFORE, said Plaintiff prays for judgment against AMS Defendants as hereinafter set forth.

## PUNITIVE DAMAGES

176.    Plaintiff will seek leave to file a claim for punitive damages under Idaho Code section 6-1604.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands trial by jury, and pray for judgment against AMS Defendants as follows:

1.    A judgment against the Defendants holding them liable, jointly and severally, for compensatory damages in a reasonable amount determined to be fair and just by the jury in this cause sufficient to adequately compensate Plaintiff for her harms and losses, including but not limited to damages:

   a.    For past and future general damages, the exact amount of which has yet to be ascertained, in an amount which will conform to proof at time of trial;

   b.    For past and future economic and special damages, according to proof at the time of trial;

   c.    For past and future medical and incidental expenses, according to proof at the time of trial;

   d.    For past and future loss of earnings and impaired earning capacity, according to proof at the time of trial;

   e.    For past and future physical pain, mental and emotional distress, according to proof at the time of trial; and

   f.    For loss of consortium;

2.      For costs, attorneys' fees, interest, or any other relief, monetary or equitable, to

which they are entitled; and

3.      For such other and further relief as the Court may deem just and proper.

Respectfully submitted.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues.


DATED this   4th   day of November, 2019.

                        COOPER & LARSEN, CHARTERED



                        By_ /s/ Reed W. Larsen
                            REED W. LARSEN



                        **MARTIN BAUGHMAN, PLLC**

                        BEN C. MARTIN (*pro hac vice* to be filed)
                        Texas Bar No. 13052400
                        LAURA J. BAUGHMAN (*pro hac vice* to be filed)
                        Texas Bar No. 00791846
                        3710 Rawlins, Suite 1230
                        Dallas, Texas 75219
                        (214) 761-6614
                        744-7590 (facsimile)
                        bmartin@martinbaughman.com
                        lbaughman@martinbaughman.com

                        **ATTORNEYS FOR PLAINTIFF**